Eastern District of Kentucky
**FILED**

JUN 2 2 2018

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

APPALACHIAN LAND CO.,

Plaintiff,

V.

EQUITABLE PRODUCTION CO.,

Defendant.

CIVIL ACTION
NO. 7:08-CV-139-KKC

**ORDER AND OPINION**

\*\*\* \*\*\* \*\*\*

This matter is before the Court on several motions. Defendant Equitable Production Company ("EQT") has filed a Motion to Dismiss (DE 89). Plaintiff Appalachian Land Company ("ALC") has filed a Motion for Partial Summary Judgment and Award of Attorney's Fees and Expenses (DE 90), and a Motion to Certify Class (DE 116).

For the following reasons, EQT's Motion to Dismiss (DE 89) is **DENIED**; ALC's Motion for Partial Summary Judgment and Award of Attorney's Fees is **GRANTED IN PART** and **DENIED IN PART**; and ALC's Motion to Certify Class is **GRANTED IN PART**.

## I. INTRODUCTION

Defendant EQT is a lessee, either by succession or as an original party, under numerous Oil and Gas leases between EQT and various other persons and entities in Kentucky, including ALC. The leases require payment of royalties by EQT based upon the market price of gas at the well, but many do not contain any express language indicating which party is responsible for paying Kentucky's severance tax. (DE 1; 89-1). Where a lease was silent, it was EQT's policy to withhold at least part of the severance tax from royalty payments. (DE 116-3 at 12-13).

1

Plaintiff ALC filed a class action complaint with this Court on July 8, 2008. (DE 1). The complaint alleged that EQT's deduction of the severance tax constituted a breach of ALC's lease contract, and those with similar language. After EQT filed its Answer, the parties moved for a stay pending an appeal in a substantially similar case: *Poplar Creek Development Co., v. Chesapeake Appalachia, LLC,* Civ. No. 08-190 (E.D. Ky. 2008) ("*Poplar Creek*"). In that case, the Sixth Circuit held that Kentucky law allowed lessees, here EQT, to deduct gathering, compression and processing costs from payment of royalties. *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC,* 636 F.3d 235, 244 (6th Cir. 2011).

While *Poplar* did not speak specifically to severance taxes, this Court found its logic applicable, and granted judgment on the pleadings for EQT as to deduction of the tax. (DE 60). ALC moved to alter the judgment, which this Court denied, and then appealed to the United States Court of Appeals for the Sixth Circuit. (DE 61; 64; 65). Finding no Kentucky law directly on point, the Sixth Circuit certified a question regarding deduction of severance taxes to the Kentucky Supreme Court. (DE 66 at 3). After reformulating the dispositive issue, the Kentucky Supreme Court held that "the producer severing natural gas from the earth [here, EQT] is *solely* responsible for the payment of the severance tax," absent a specific contractual provision apportioning the tax. *Id.* at 3-4. On October 27, 2015, the Sixth Circuit reversed this Court's judgment on the pleadings, and remanded for further proceedings consistent with the state Court's holding. *Id.*

In July 2016, and admittedly in response to the Kentucky Supreme Court decision, EQT ceased deducting the severance taxes from royalties paid under market value leases without express severance tax language. (DE 89-1; DE 89-3 at 3). On March 7, 2017, EQT reimbursed royalty owners for deductions taken from 1995 through 2016, by sending approximately 2,431 reimbursement checks. (DE 119-2). EQT alleges that it paid $1,398,167.71 in

2

reimbursements, and also placed $62,710.44 in a suspense account for reimbursing recipients that have not yet been accurately identified. *Id.* ALC admits to receiving a reimbursement check, but has not cashed that check. (DE 91 at 3).

EQT has since filed a motion to dismiss ALC's claim for breach of contract, arguing that its reimbursement of the deducted severance tax has mooted the claim. (DE 89-1). ALC has filed a motion for partial summary judgment, seeking judgment on EQT's liability for breach of the lease and for attorney's fees. (DE 90-1). ALC also requests that the Court certify the class of "[a]ll persons and entities who have entered into oil and gas leases with [EQT]...which obligate the lessee to pay royalties on gas produced from wells, which leases do not expressly authorize the deduction of severance taxes after it is severed from the wellhead." (DE 116). The motions have been sufficiently briefed, and the Court considers the arguments below.

## II. ANALYSIS

### A. Defendant EQT's Motion to Dismiss (DE 89)

On June 5, 2017, EQT filed a motion to dismiss ALC's claim for breach of contract in its entirety. (DE 89). EQT argues that, since it previously reimbursed royalty owners for withheld severance taxes dating back to 1995, ALC's claim has become moot. (DE 89-1 at 4). Further, EQT points out that it ceased the deduction of the severance taxes for market value leases without express severance tax language in 2016, meaning the desired effect of the litigation has already been achieved. *Id.* at 4.

ALC has responded, arguing that EQT's reimbursement check amounted to a settlement offer, which ALC rejected when it did not cash the check. (DE 91 at 3). ALC cites the recent United States Supreme Court case *Campbell-Ewald v. Gomez*, for the proposition that a rejected settlement offer has no effect on the plaintiff's interest in the lawsuit. (DE 91 at 3); *see also Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663, 672 (2016). Further, ALC asserts that

3

it seeks relief beyond what was offered by EQT, namely deducted severance taxes dating back to July of 1993, prejudgment interest, and attorney's fees. (DE 91 at 5). Therefore, ALC concludes that, at best, EQT's reimbursement of severance taxes dating back to 1995 only offers a portion of ALC's requested relief, and there remains an active controversy. *Id.*

EQT characterizes the ALC reimbursement check as performance under the lease agreement. (DE 96 at 1-2). EQT has pointed out that, unlike the Rule 68 settlement offer in *Campbell-Ewald*, its reimbursement check did not require agreement to any conditions, restrictions, or indicate that it was intended as settlement of any outstanding claim. *Id.* at 3. And—under the lease agreement between EQT and ALC—depositing the check in the mail fully satisfied its payment obligation, mooting ALC's claims. *Id.* at 4. EQT argues that any remaining claims to prejudgment interest and attorney's fees are not legally sufficient to create a controversy. *Id.* at 6-15.

A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016) (internal citations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* Here, ALC retains a stake in the outcome of the litigation—regardless of whether EQT's reimbursement check is treated as a settlement offer or performance—because it claims entitlement to damages beyond what EQT included in the reimbursement check.

EQT admits that it has reimbursed royalty owners which could be identified, including ALC, for withheld severance taxes dating back to 1995. (DE 89-1 at 4). But ALC alleges that it is entitled to relief dating back to 1993. (DE 91 at 5). Even without consideration of attorney's fees and interest, it is clear that EQT has not tendered an offer that fully satisfies ALC's demand for relief, and thus the check has not mooted ALC's claims. *See Mey v. N. Am.*

4

*Bancard, LLC,* 655 Fed.Appx. 332, 336 (6th Cir. 2016). And while EQT argues that it has no records by which to calculate reimbursements prior to 1995, the difficulty that ALC may face in proving the amount of reimbursement for those years does not itself moot the claims. *See Hrivnak v. NCO Portfolio Management, Inc.,* 719 F.3d 564, 567-568 (6th Cir. 2013) ("As defendants would have it, claims with little to no chance of success should be dismissed as moot whenever they are mixed in with promising claims that a defendant offers to compensate in full. That is not how it works").

EQT further argues that ALC cannot claim, and the Court should not consider, reimbursement for severance taxes prior to 1998, since 1998 is the year in which ALC first acquired an interest in the lease. But this argument is not persuasive, as it confuses the merits of a claim with the existence of a live controversy. ALC contends that its purchase of the lease agreement included purchase of the rights to royalty payments prior to 1998—EQT simply disagrees. EQT may not moot ALC's claim by only offering what it believes ALC is entitled to recover. *See Hrivnak,* 719 F.3d at 567-568 ("Reasonable though the defendants' offer may have been (and may still prove to be), the disparity between what they offered and what the plaintiff sought generally will preclude a finding of mootness").

At the motion to dismiss stage, the Court will construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff. *See Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 538 (6th Cir. 2012). Here, ALC claims royalties have been withheld since at least July, 1993 (DE 91 at 5); that it has not deposited EQT's reimbursement check (DE 103-1 at 5); that the check is not for the complete amount owed under the lease agreement and thus does not cure EQT's breach (DE 103-1 at 5-7)); and EQT admits that its check, even if deposited, would not reimburse ALC for royalties prior to 1995 (DE 89-1 at 3-4). Not only does this preclude the Court from finding ALC's claims to be mooted as discussed above, but ALC has also stated a

5

claim upon which relief can be granted. As such, EQT's Motion to Dismiss ALC's claim for breach of contract (DE 89) is denied.

## B. Plaintiff ALC's Motion For Partial Summary Judgment and For Partial Award of Attorney's Fees and Expenses (DE 90)

Having determined that ALC's claims are not mooted, the Court addresses summary judgment. On June 23, 2017, ALC filed a motion for partial summary judgment, arguing that it is entitled to judgment as to liability on the breach of contract claim and should be awarded attorney's fees. (DE 90). EQT has opposed both parts of the motion. (DE 98).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden and must identify "those portions of the pleadings...which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation omitted).

Once the movant meets the initial burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In the Court's consideration of the motion, "the evidence should be viewed in the light most favorable to the non-moving party." *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 255).

### 1. Breach of Contract

Under Kentucky law, breach of contract requires showing (1) the existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach. *Metro Louisville/Jefferson County Government v. Abma,* 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). Here, the existence of a contract is admitted by both parties. *See* (DE 10 at 2, pp. 9). ALC argues that EQT breached the contract when it failed to pay the full amount of royalties owed, namely through deduction of the severance tax which the Kentucky Supreme Court has

6

clarified as improper. *See Appalachian Land Co. v. EQT Production Co.,* 468 S.W.3d 841, 848 (Ky. 2015); (DE 90-1 at 13). ALC has provided evidence that EQT withheld at least $11,453.41 in royalty payments to ALC during the relevant time period. (DE 90-5 at 6-7).

EQT attacks summary judgment in two ways. First, EQT argues that the Kentucky Supreme Court decision should not be applied retroactively against it, but rather should be applied only prospectively. (DE 98 at 2-6). Second, EQT raises several affirmative defenses, including payment and acceptance, accord and satisfaction, laches, and estoppel.

### a. Retroactivity of Kentucky Supreme Court Decision

EQT is correct that the Kentucky Supreme Court recognizes its own ability to give a decision prospective or retroactive application. *See Hagan v. Farris,* 807 S.W.2d 488, 490 (Ky. 1991). And under Kentucky law, "[i]t is...permissible to have a decision apply prospectively in order to avoid injustice or hardship." *Id.* But giving retroactive application to a judicial decision appears to be the general rule in Kentucky:

> While we may occasionally exercise our discretion to make application of a holding prospective only, we, nonetheless, generally embrace the idea that although legislation may only apply prospectively, judicial decisions generally apply retroactively. And we have generally made decisions prospective only when overruling old precedent upon which the losing party has relied. This case does not overrule precedent so we see no reason to limit application prospectively.

*Branham v. Stewart,* 307 S.W.3d 94, 102-03 (Ky. 2010) (Applying matter of first impression regarding attorney-client privilege retroactively); *see also Founder v. Cabinet for Human Resources,* 23 S.W.3d 221, 223-24 (Ky. 1999) (holding that prior judicial decision put plaintiff "on notice" and so it was not error for the court to retroactively apply a new decision).

In this case, the Kentucky Supreme Court did not specify whether their holding that "Appalachian is not liable for any portion of the natural gas severance tax" should apply retroactively or prospectively. *See Appalachian Land Co. v. EQT Production Co.,* 468 S.W.3d 841, 848 (Ky. 2015). But the decision expressly relied on a case decided in 1946, *see Burbank*

7

*v. Sinclair Prairie Oil Co.,* 304 Ky. 833, 202 S.W.2d 420 (1946), which the Kentucky Court found to "address[ ] a nearly identical issue." *Appalachian Land Co.*, 468 S.W.3d at 843. Instead of overruling the seventy-year-old precedent, the Kentucky Supreme Court found it "controlling and that its logic remains sound." *Id.* at 847. The Court was clear that it was reading the severance tax statute according to its "plain meaning and with guidance from *Burbank*." *Id.* at 845. On such a record, and without contrary guidance from the state Court, this Court finds the general rule applicable and the Kentucky Supreme Court's decision to apply retroactively.

EQT urges the Court to consider the *Chevron Oil* factors when determining the retroactivity of the Order. *See generally Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349 (1971). But in this case, *Chevron Oil* and its progeny weigh in favor of retroactivity. For the reasons cited above, the Kentucky Supreme Court does not appear to regard its decision as making a new principle of law or deciding an issue of first impression that was not foreshadowed; the state Court adopted the same interpretation as was applied to the statutes prior iteration; and this Court has been presented with no evidence of an inequitable result if the ruling is applied retroactively. *See Chevron Oil Co.,* 404 U.S. at 106-107; *see also Founder,* 23 S.W.3d at 224.

### b. Defenses Asserted by EQT

Next, EQT argues that summary judgment in favor of ALC is improper given the numerous affirmative defenses cited within its brief, including accord and satisfaction, payment and acceptance, laches, and estoppel. The Court finds these arguments to be without merit.

Under the doctrine of accord and satisfaction, "an offer in satisfaction of a claim must be accompanied by an express condition that the acceptance is in full satisfaction of the claim and that the offeree takes the money subject to such a condition. In lieu of an express

8

condition, the circumstances must clearly indicate to the creditor that this condition is present." *Liggons v. House & Associates Ins.,* 3 S.W.3d 363, 365 (Ky. Ct. App. 1999) (quoting *Bruestle v. S & M Motors, Inc.,* 914 S.W.2d 353, 354 (Ky. Ct. App. 1996). In this case, EQT has repeatedly denied that any condition whatsoever accompanied the check that it mailed to ALC. *See e.g.,* (DE 96 at 3, Defendant's Reply to Motion to Dismiss) ("Nothing in the letter indicates that the recipient was required to agree to any conditions or restrictions. Nor does it indicate that the reimbursement was intended as a settlement or compromise of any outstanding claims. The check itself is also devoid of any such conditions or restrictions"). As such, the Court is not persuaded by EQT's argument that ALC's receipt of the reimbursement check amounted to accord and satisfaction.

Similarly, EQT argues that ALC's acceptance of the various royalty checks that it sent throughout the years, despite those checks being for an inadequate sum, constitutes an "account stated which bars [ALC's] claims herein due to payment and acceptance." (DE 98 at 9). But under Kentucky law:

> The general rule on an account stated is that there must have been prior dealings between the parties, and after an examination of all the items by each of the parties, they must have mutually agreed upon the items of the account, and that the balance struck is just and due from the party against whom it is stated. An account stated amounts to more than an admission of an amount due. It is a new claim for relief and in a suit upon such an account, the inquiry is not directed to the original transaction out of which the account arose, but is directed to the questions of whether the parties had in fact agreed upon the amount due and whether the same was unpaid.

11 Ky. Prac. Civ. Proc. Forms § 11:1 (citing *Harris v. Edward J. Miller & Son, Inc.,* 453 S.W.2d 739 (Ky. 1970)). Here, ALC has not purported to sue on an account stated theory, but rather simply for money due on an account. *See Harris,* 453 S.W.2d at 740. And EQT provides no evidence that a statement as to the overall account or its outstanding balance was ever communicated, much less agreed upon by ALC. *See Sports South, LLC v. Johnson,* No. 5:13-CV-266-JMH-REW, 2014 WL 1883703 *3 (E.D. Ky. May 1, 2014). The remittance

statements provided by EQT appear to be limited to single, monthly calculations of particular royalty payments, and do not provide a statement of the account or its balance. (DE 98-2). On such facts, the Court cannot find that the account was somehow stated, or that ALC agreed as to the amount due on the account and whether the same was unpaid, and EQT cites no Kentucky authority holding otherwise.

Under Kentucky law, EQT cannot avail itself of laches and estoppel. The defense of laches bars claims where a party engages in unreasonable delay to the prejudice of others, rendering it inequitable to allow that party to reverse a previous course of action. *See Plaza Condominium Ass'n, Inc., v. Wellington Corp.,* 920 S.W.2d 51, 54 (Ky. 1996). But here, ALC asserted its claims within the statute of limitations. And EQT's only argument as to detriment is ALC's request for interest, attorney's fees, and costs over and above the reimbursements already made by EQT. (DE 98 at 12). The Court finds that this "detriment" does not rise to the level of prejudice needed to equitably bar ALC's claims—quite the opposite, EQT surely gained a benefit from the royalty payments it admits to withholding for years.

Finally, estoppel involves intentional conduct that causes the other party to detrimentally rely on the party's false or inconsistent representations or concealment of material facts. *See Journey Acquisition-II, L.P. v. EQT Production Co.,* 39 F.Supp.3d 877, 889 (E.D. Ky. Aug. 18, 2014) (citing *Edmondson v. Pennsylvania Nat'l Mut. Casualty Ins. Co.,* 781 S.W.2d 753, 755-56 (Ky. 1989)). Even ignoring EQT's failure to put forth any evidence that it changed its position based on a representation or concealment by ALC, EQT offers no prejudice other than what this Court has previously rejected above.

Finding no defense applicable, the Court grants summary judgment as to liability on ALC's breach of contract claim.

## 2. Attorney's Fees

In its motion for partial summary judgment, ALC asks the Court to award attorney's fees in the amount of $486,959.38—a figure ALC alleges is equal to one-third the amount EQT has thus far reimbursed to royalty owners. (DE 90-1 at 20). ALC asserts three grounds by which it is entitled to the award: (1) pursuant to statute; (2) under the common fund exception to the America Rule; and (3) in equity. *Id.* at 15. The Court finds none of these ground applicable at this time.

KRS 412.070, in relevant part, provides:

> In actions for the...recovery of money or property which has been illegally or improperly collected, withheld or converted, if one (1) or more of the legatees, devisees, distributees or parties in interest has prosecuted for the benefit of others interested with him, and has been to trouble and expense in that connection, the court shall allow him his necessary expenses, and his attorney reasonable compensation for his services, in addition to the costs. **This allowance shall be paid out of the funds recovered before distribution**.

KRS 412.070(1) (emphasis added). Kentucky law has been clear that "the statute unequivocally requires that attorney fees awarded under this statute must be paid from the funds recovered. Shall means shall." *Cummings v. Covey,* 229 S.W.3d 59, 62 (Ky. Ct. App. 2007). But in this case, the Court has not ordered any funds to be recovered or distributed. Thus, any award of attorney's fees at the current stage in litigation would go beyond recovery, which the statute does not allow. Even if the Court should indulge ALC's request to treat EQT's reimbursement checks as "funds recovered," the plain language of the statute requires that attorney's fees be paid "before distribution," and it is clear that the reimbursement checks have already been mailed and, in many cases, cashed. KRS 412.070(1); (DE 90-1 at 10; DE 98-2). As such, ALC's current request for fees and expenses is simply inconsistent with the plain language of KRS 412.070(1).

Second, ALC argues the Court may award the fees it requests under the common fund exception to the American Rule for attorney's fees. That exception allows a litigant or lawyer

11

who recovers a common fund for the benefit of persons other than himself or his client to collect a reasonable attorney's fee from the fund as a whole. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 479, 100 S.Ct. 745 (1980). Kentucky law also recognizes the common fund doctrine. *See King v. City of Covington,* 160 S.W.2d 13, 14 (Ky. 1942). But here, no fund has been created by way of settlement, judgment, or otherwise. The Court declines to apply the common fund doctrine where there is no creation of a fund to be divvied up among the plaintiffs. *See generally Geier v. Sundquist,* 372 F.3d 784, 790 (6th Cir. 2004). ALC asks the Court to find a constructive fund by adding up all the reimbursement checks sent by EQT to leaseholders in the wake of the Kentucky Supreme Court decision, and awarding ALC a percentage of that number. (DE 90-1 at 17-19). The reimbursements were made directly to leaseholders months before the current dispositive motions or any attempt at class certification. (DE 98-2). Accordingly, the Court finds that the creation of a constructive fund *ad hoc* and for the sole purpose of attorney's fees—when an actual fund may yet materialize— is premature at best.

Finally, ALC asks the Court to award it attorney's fees in equity. (DE 90-1 at 19). But the Kentucky Supreme Court has held that, without a sound basis in contract or statute, a trial court may not award attorney's fees. *See Bell v. Com., Cabinet for Health and Family Services,* 423 S.W.3d 742, 748-50 (Ky. 2014). The Court in *Bell* clarified that:

> [T]rial courts may not award attorney's fees just because they think it is the right thing to do in a given case. That is not what the law of Kentucky allows, and their inherent powers do not extend beyond stated law. In other words, a trial court may not ignore the law and apply its will, no matter how sound it believes the reason to be. This obviously would create legal chaos.

*Id.* at 750. While *Bell* recognized a narrow exception for an award of attorney's fees as a sanction when there has been an intrusion on the very power of the court, that exception is not applicable here. Further, there has not yet been an inequity. While this case has a long

history, ALC has only recently moved for class certification, and there is no indication that counsel will not have an opportunity to recover a reasonable fee for the work it has performed at the conclusion of the case. As such, the Court denies ALC's request for attorney's fees at this time.

## C. Plaintiff ALC's Motion For Class Certification (DE 116)

On September 21, 2017, and over nine years after the complaint was filed, ALC moved to certify the following class:

> All persons and entities who have entered into oil and gas leases with Equitable, or its predecessors in title, covering lands in Kentucky, which obligate the lessee to pay royalties on gas produced from wells, which leases do not expressly authorize the deduction of severance taxes after it is severed from the wellhead.

(DE 116-1 at 9). ALC proposes a Class period from July 8, 1993, through July 31, 2016, or such date when EQT ceased its improper withholding practice. *Id.* Due to obvious discrepancies between those who have accepted EQT's reimbursement of royalties, and those who have not, ALC suggests division of the class into two subclasses. (DE 120 at 10).

Class certification is only appropriate if this Court finds, after conducting a "rigorous analysis," that the requirements of Federal Rule of Civil Procedure 23 have been met. *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350-51, 131 S.Ct. 2541 (2011) (citation omitted). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* District Courts maintain substantial discretion in determining whether to certify a class. *Rikos v. Procter & Gamble Co.,* 799 F.3d 497, 504 (6th Cir. 2015).

The party seeking class certification must affirmatively demonstrate his compliance with Rule 23. *Dukes,* 564 U.S. at 350, 131 S.Ct. 2541. This entails showing that a putative class satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequate representation—and fits within one of the three types of classes listed in Rule 23(b).

13

*Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.,* 863 F.3d 460, 466 (6th Cir. 2017). Classes under Rule 23(b)(3) also must meet an implied ascertainability requirement. *Id.* Finally, all sub-classes must meet the same requirements as a class. *See Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir. 1974); *see also* Fed. R. Civ. Pro. 23(c)(5).

At the outset, it should be noted that after nearly ten years of litigation in this case, it is entirely unknown how many potential class members have claims to withheld severance taxes prior to 1995. EQT claims that 1995 is the earliest year for which it has electronic accounting records for royalties; that it has no records with which to identify any particular lessor from whom severance taxes may have been withheld in either 1993 or 1994; and it is "not able at this point to identify the severance taxes between '93 and '94." (DE 119 at 8-9; DE 119-1 at 2).

While this Court has allowed ALC's claim for additional reimbursement to continue, it has done so at a stage in the litigation in which it must take ALC's plausible factual allegations as true. Now, ALC bears the burden of proving its suggested class meets the requirements of Rule 23. Despite the familiarity of the parties at this point in the litigation, ALC has suggested no other method for determining how much EQT owed for those years, or to whom they owed it. *See* (DE 120 at 8) (ALC suggesting the Court may "ultimately handle this very simple issue by carving 1993 and 1994 out of the class period"). No evidence has been submitted as to the numerosity of this potential subclass, or the feasibility of identifying its members.

While the Sixth Circuit has previously endorsed classes in which discernment of members required substantial manual review, the district courts in those cases believed the defendants' records could provide reasonable accuracy as to class membership. *See Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 541 (6th Cir. 2012) ("[T]he district court agreed with Plaintiffs that the subclasses can be 'discerned with reasonable accuracy' using Defendants'

14

electronic records and available geocoding software, though the process may require additional, even substantial, review of files"); *see also Rikos,* 799 F.3d at 525-27 (ascertaining class members was possible through substantial review of Defendant's internal data supplemented by outside files).

In this case, and after nearly ten years of litigation, ascertaining potential members of a class from 1993 and 1994 still appears to be based *entirely* on review of individual land records. Conducting such individual mini-trials for the entire membership of the class is not consistent with the requirement that the Court have an administratively feasible way of determining class membership. *See e.g., EQT Production Co. v. Adair,* 764 F.3d 347, 359 (4th Cir. 2014) ("[R]esolving ownership based on land records can be a complicated and individualized process...In our view, these complications pose a significant administrative barrier to ascertaining the ownership classes"). As such, the Court will not include the period of 1993 and 1994 in the class to be certified at this time. The Court will consider the remaining two potential subclasses below.

### 1. Subclass of Lessors Who Cashed Reimbursement Checks

ALC acknowledges that many of the potential class members have already received and cashed reimbursement checks sent by EQT that cover severance tax deductions from 1995 to 2016. According to EQT, it issued reimbursement checks to approximately 2,431 market value lessors in March 2017, following the decision by the Kentucky Supreme Court. (DE 119-2). Of those lessors, approximately 1,538 have accepted and cashed the reimbursement checks. *Id.* This raises a question as to the relief this Court can offer a plaintiff who is asking for reimbursement of royalties, but has already been reimbursed those royalties.

### a. Standing

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies. *Genesis Healthcare Corp. v. Symczyk,* 569 U.S. 66, 71, 133 S.Ct. 1523 (2013).

15

"If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* (citing *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477-78, 110 S.Ct. 1249 (1990)). This limitation ensures that federal courts confine themselves to their "constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Id.*

In this case, ALC does not provide any evidence that the reimbursement checks sent by EQT were deficient for the time period they were meant to reimburse. Other than arguing that some unknown number of potential class members may be owed an unknown amount of severance taxes prior to 1995—an argument addressed above—ALC presents no evidence that lessors who cashed reimbursement checks were given less than what was originally withheld. Instead, ALC argues that, despite recovery of the withheld severance taxes, prejudgment interest and attorney's fees are still at issue for this subclass. (DE 120 at 9-10).

First, the subclass' entitlement to prejudgment interest is unclear. The Court notes that ALC's complaint requests "[a] judgment in favor of the Plaintiff and the Class against [EQT] for damages suffered as a result of [EQT's] breach of the Oil and Gas Leases; [and] for statutory prejudgment interest." (DE 1 at 8). But for those lessors who have already accepted reimbursements for the withheld severance taxes, there will likely be no underlying judgment for damages upon which the Court could charge interest.

Second, the Court is persuaded by the many jurisdictions holding that the potential claims that remain for the reimbursed lessors are simply insufficient to confer standing. *See Friedman v. Dollar Thrifty Automotive Group, Inc.,* 227 F.Supp.3d 1192, 1203 (D. Co. Jan. 5, 2017) (standing does not exist where a person has been paid in full as to the amount allegedly wrongfully withheld, but was not paid interest on the amount); *see also Stanford v. Home Depot U.S.A., Inc.,* 2008 WL 7348181 *8, No. 07-CV-2193-LAB-(WMC) (S.D. Cal. May 27,

2008) (finding no standing personally or as representative of a putative class where plaintiff was reimbursed for amount previously overcharged); *see also Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 361 n. 10 (3rd Cir. 2013) (finding purchase of Service Plan could not be basis for class certification where plan was honored and "Sam's Club also offered to refund Hayes the cost of the Service Plan, but Hayes refused to accept the refund"); *see also Becker v. Skype Inc.,* 2014 WL 556697 *3, No. 5:12-CV-6477-EJD (N.D. Cal. Feb. 10, 2014) ("Plaintiff also fails to cite any precedent or statutory authority to support his argument that he is entitled to interest on his refund, let alone that the loss of that interest constitutes sufficient injury to establish standing"). Further, this putative subclass' interest in recovering attorney's fees does not confer standing. *See e.g., Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 480, 110 S.Ct. 1249 (1990) ("This interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim").

### b. Superiority

Even if this subclass of lessors were to have standing, the Court finds that ALC has failed to satisfy the requirements of Rule 23(b)(3), the section under which ALC requests certification. (DE 116-1 at 9). That rule requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3). The rule is designed to "achieve economies of time, effort, and expense, and promote...uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231 (1997) (quoting Fed. R. Civ. P. 23 Advisory Committee Notes).

To effectuate this purpose, and in light of the occasional extensive efforts undertaken by defendants to make potential plaintiffs whole prior to class certification, district courts in

various jurisdictions across the country have considered out-of-court efforts in determining whether the class mechanism is truly a superior form of adjudication. *Berley v. Dreyfus & Co.,* first articulated this position:

> Although Dreyfus & Co.'s offer to refund the purchase price to its customers is not quite 'another method for the fair and efficient adjudication of the controversy,' we think that subparagraph (b)(3) read as a whole reflects a broad policy of economy in the use of society's difference-settling machinery. One method of achieving such economy is to avoid creating lawsuits where none previously existed. This is in part why 'the extent and nature of any litigation...already commenced' is pertinent to the required finding. If a class of interested litigants is not already in existence the court should not go out of its way to create one without good reason.

*Berley v. Dreyfus & Co.,* 43 F.R.D. 397, 398-99 (S.D.N.Y. 1967). More recently, the United States Court of Appeals for the Seventh Circuit affirmed a District Court's decision to deny class certification where refunds afforded class members a comparable or even better remedy than they could hope to achieve in court. *See In re Aqua Dots Prod. Liab. Litig.,* 654 F.3d 748, 753 (7th Cir. 2011). While the District Court framed its decision in terms of the superiority requirement of Rule 23(b)(3), the Seventh Circuit indicated Rule 23(a)(4) provided the more appropriate analysis:

> Although the district court's rationale is mistaken, it does not follow that the court's decision is wrong. Other parts of Rule 23 give a district judge ample authority to decide whether a class action is the best way to resolve a given dispute. Instead of departing from the text of Rule 23(b)(3), the district court should have relied on the text of Rule 23(a)(4), which says that a court may certify a class action only if "the representative parties will fairly and adequately protect the interests of the class." Plaintiffs want relief that duplicates a remedy that most buyers already have received, and that remains available to all members of the putative class. A representative who proposes that high transaction costs (notice and attorney's fees) be incurred at the class members' expense to obtain a refund that already is on offer is not adequately protecting the class members' interests.

*Id.* Whether under the superiority inquiry of Rule 23(b)(3), or the broader duty for a representative party to fairly and adequately protect the interests of the class set out in Rule 23(a)(4), the above approach has been increasingly adopted in district courts across the

country. *See Holland v. Goodyear Tire & Rubber Co.,* 75 F.R.D. 743, 748 (N.D Ohio 1975) ("Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute"); *see also Chin v. Chrysler Corp.,* 182 F.R.D. 448, 463 (D.N.J. 1998) (finding a lack of superiority where reimbursement was available through recall program and through administrative remedy); *see also In re Phenylpropanolamine (PPA) Prod. Liab. Litig.,* 214 F.R.D. 614, 622 (W.D. Wash. 2003) ("It makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress"); *see also In re Conagra Peanut Butter Prod. Liab. Litig.,* 251 F.R.D. 689, 699-700 (N.D. Ga. 2008) (finding Defendant's voluntary refund program superior to class certification).

The Sixth Circuit does not appear to have spoken directly to the line of cases above, but has directed that:

> [D]istrict court[s] should also compare other means of disposing of the suit to determine if a class action 'is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court.'

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.,* 654 F.3d 618, 630 (6th Cir. 2011) (quoting 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1779 (3d ed. 2010). The section of Wright, Miller, & Kane quoted by the Sixth Circuit goes on to state, "[t]he court need not confine itself to other available 'judicial' methods of handling the controversy in deciding the superiority of the class action." Miller, *supra*, at § 1779.

In this case, well over half of the potential class members have already taken advantage of the reimbursements issued by EQT—they have received what was previously deducted without losing a cut to the class action mechanism. Certification is not necessary for their

19

redress, and inclusion in the class action at this point would simply subject them to protracted and unnecessary litigation. The Court finds that those who have already taken advantage of the refund offered by EQT have found a method of difference-settling superior to the class action, and they found it months before the motion for certification. For these reasons, the Court declines to clawback payments already received, withhold amounts from future royalty payments in favor of ALC's attorney fees as suggested by ALC, or otherwise subject this subclass to an unnecessary class action.

## 2. Subclass of Lessors Who Have Not Cashed Reimbursement Checks

Of the 2,431 reimbursement checks issued by EQT, approximately 893 checks have not been cashed as of November 6, 2017. (DE 119-2). Of those 893 checks, approximately 462 have been returned to EQT by the United States Postal Service because the addressee has moved, is deceased, has conveyed their interest in the lease, or for other reasons. *Id.* On the remaining checks, approximately 431 in number, there has been no action—the checks have not been returned nor cashed. *Id.* ALC argues that these 893 lessors have viable claims against EQT, and a class action is the superior method for adjudicating their claims. (DE 116-1 at 9). The Court agrees, and will certify the following class based upon the above analysis and ALC's requested class definition:

All persons and entities that, during the period of January 1, 1995 through July 31, 2016, were lessors on Oil and Gas Leases with Equitable, or its predecessors in title, covering lands in Kentucky, which obligate the lessee to pay royalties on gas produced from wells at a rate of one-eighth of the market price received at the wellhead and which leases do not authorize the deduction of severance taxes, or other costs, and/or expense incurred to market such gas after it is severed from the wellhead. The defined Class excludes: (1) the United States of America; (2) any Judge or Magistrate presiding over this action and members of their families; (3) Equitable, its affiliates, its predecessors-in-interest, and its respective employees, officers and directors; and (4) potential members of the class who have been paid and accepted reimbursement for withheld severance taxes during the class period.

Such a class meets the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In this case, EQT has admitted that at least 893 lessors have not been reimbursed for withheld severance taxes. At that number, joinder of all members is impracticable and numerosity is met. Fed. R. Civ. Pro. 23(a)(1); *see also In re American Med. Systems, Inc.,* 754 F.3d 1069, 1079 (6th Cir. 1996) ("When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by numbers alone").

ALC has also shown that all members of the class will try to prove the same alleged injury. Namely, EQT's policy of unilaterally deducting severance taxes from royalty payments when leases were silent as to the party responsible for bearing the tax—a policy EQT appears to have applied across all of its leases during the time period. (DE 116-3 at 12-13). This common contention is capable of classwide resolution, and thus the commonality requirement of Rule 23(a)(2) is met. *See Dukes,* 564 U.S. at 349-50, 131 S.Ct. 2541.

The injury to ALC is typical of the injury affecting the rest of the class. Here, both ALC and the rest of the class allege injury from the same EQT policy. While the time periods or amounts alleged to have been withheld may differ from member to member, all class members allege injury by a common element. *See Senter v. General Motors Corp.,* 532 F.2d 511, 525 n. 31 (6th Cir. 1976). Further, ALC's interest is clearly aligned with those of the rest of the class—by pursuing its claims, it will further the interests of those other class members who have either not received or not accepted reimbursement from EQT. *See In re American Med. Systems, Inc.,* 754 F.3d 1069, 1082 (6th Cir. 1996).

The Court also finds that ALC will adequately and fairly protect the interests of the parties. ALC has litigated this case for nearly a decade in several forums, including the United States Court of Appeals for the Sixth Circuit and the Kentucky Supreme Court. It is clear that ALC will vigorously prosecute this case through qualified counsel and, having

narrowed the class to those potential members that are similarly situated to ALC, it is also clear that ALC has the necessary common interests with the rest of the class. *See Senters v. General Motors Corp.,* 532 F.2d 511, 525 (6th Cir. 1976). EQT claims that it has reimbursed ALC's predecessor in interest for withheld severance taxes prior to 1998, and thus ALC is necessarily in conflict with a member of the class, since it also claims to be owed amounts prior to 1998. (DE 119 at 26). But the Court's narrowing of the class definition remedies this problem. If ALC's predecessor in interest has received and accepted reimbursement as EQT indicates, it will not be a member of the class. Further, the Court is not persuaded that EQT can manufacture a conflict with the named plaintiff of a class action by unilaterally paying the money claimed by the named plaintiff to another party.

Finally, ALC has properly shown both predominance and superiority as to this class— two requirements for certification under Rule 23(b)(3). Here, questions common to the class predominate. Two such questions are (1) whether EQT deducted severance taxes from market value leases that were silent as to the tax; and (2) whether the Kentucky Supreme Court ruling should be applied retroactively. The class will necessarily prevail or fail in unison on these issues, and predominance is met. *See In re Whirlpool Corp.,* 722 F.3d 838, 858-59 (6th Cir. 2013).

And unlike the lessors who have accepted reimbursement from EQT, the members of this class have, for whatever reason, not taken advantage of the out-of-court remedies. In consideration of those lessors who it admits have not been accurately identified, EQT claims to have setup a fund of approximately $62,000.00 for those lessors reimbursement. (DE 89-1 at 3-4; 89-3 at 4). But EQT also admits that, as of November 2017, 462 checks totaling $162,827.49 have been returned to EQT by the United States Postal Service because the addressee has moved, is deceased, has conveyed their interest in the lease, or for other reasons. (DE 119-2). EQT further admits that 431 checks totaling $123,140.35 have not been

22

returned to EQT and have not been cashed. *Id.* Even beyond the lack of any discussion as to how EQT will continue to seek out lessors, the suspense account cannot reimburse all remaining lessors. Thus, the Court finds that the class action mechanism is superior to EQT's reimbursement procedure as to this class. Given that the withheld severance taxes may not be large enough for class members to pursue individually, *see* (DE 90-1 at 14) (EQT withheld approximately $11,453.41 from ALC), a class action is also superior to individual suits. *See In re Whirlpool,* 722 F.3d at 861. And unlike the time period of 1993 through 1994, in which no members have been accurately identified, EQT appears to have a good start on ascertaining over half of the class, as evidence by its mailings.

Satisfied that ALC has carried its burden of proving the elements of Rule 23(a), and the further requirements of Rule 23(b)(3), the Court certifies the class setout above.

### III. CONCLUSION

Accordingly, the Court **HEREBY ORDERS** as follows:

(1) Defendant EQT's Motion to Dismiss (DE 89) is **DENIED**;

(2) Plaintiff ALC's Motion for Partial Summary Judgment and Award of Attorney's Fees (DE 90) is **GRANTED** as to liability on its breach of contract claim; and **DENIED** as to ALC's request for attorney's fees; and

(3) Plaintiff ALC's Motion to Certify Class (DE 116) is **GRANTED IN PART,** consistent with the foregoing analysis of the Court and only as to the class certified in section (II)(C)(2) of this opinion.

Dated June 22, 2018.



Signed By:
Karen K. Caldwell
United States District Judge